

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-10-00085-CV

_____

IN THE MATTER OF THE MARRIAGE OF
DAPHNE ALLEN AND JAMES ALLEN AND
IN THE INTEREST OF J.T.A. AND K.R.A., MINOR CHILDREN

On Appeal from the County Court at Law
Rusk County, Texas
Trial Court No. 2008-09-405-CCL

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

This appeal arises from the trial court's property division in the divorce proceeding between Daphne Allen and James Allen. James contends that a mediator attempted to act as an arbitrator without an agreement for binding arbitration and, consequently, the trial court erred in dividing the marital property as found by the mediator. We disagree with James' contention that arbitration occurred. Rather, pursuant to a binding mediation settlement agreement, the mediator was called upon to resolve a factual dispute concerning the scope of the mediation. We affirm the trial court's judgment.

## I.      Factual and Procedural Background

On April 24, 2009, the Allens entered into a mediation settlement agreement (MSA) resulting in settlement regarding the division of property. With regard to the marital residence, the agreement stated:

> The marital residence real property and all improvements located thereon shall be partitioned pursuant to the map attached hereto as Exhibit "B" and incorporated by reference for all purposes. Wife shall receive the property marked in RED and Husband shall receive the property marked in YELLOW. Wife shall grant Husband a perpetual easement of ingress and egress as set forth on Exhibit "B" and marked in BLUE/GREEN.

A map of the property with such markings purporting to divide the property by agreement was attached to the MSA as Exhibit B. For clarity, we summarize Exhibit B in visual form below.

2



Prop to H

Disputed Property
(not color coded)

Fence Line Just Beyond 2nd
Pond And Includes Hay Field
But Not Alfalfa Field

Prop
to W

Access Easement

ROAD

In boldface type, the MSA, signed by both parties and their counsel, recited that it was "binding on the parties," "and not subject to revocation, repudiation or withdrawal of consent." It further stated,

> [e]ach party stipulates and agrees that he and she have been cautioned to read this entire document word-for-word and to ask questions he or she may have about this Agreement to his or her respective attorneys . . . each party stipulates and represents to the other and to their attorneys that:  (a) each is signing this Agreement only after having read this entire document carefully, word-for-word; (b) each has been afforded an opportunity to ask any questions he or she may have about this Agreement of his or her lawyer outside the presence of the mediator and the other party, and each is completely satisfied with the legal representation he and she have received today.

3

The MSA provided "that the mediator, Karen D. Bishop, would be the "sole arbiter of any disagreement with regard to the drafting and intent of the final documents to effectuate this Agreement." The trial court was presented with the MSA at a hearing in which Daphne suggested that the agreement covered division of all property.

After the execution of the MSA, a dispute arose regarding the fifty-nine-acre tract of land included within Exhibit "B" of the MSA, but not specifically designated as the property of either party on the Exhibit. The dispute was decided by Bishop,[1] who made the following finding:

> It is my belief that the parties intended to divide ***ALL*** of the realty of the community estate. It is also my belief that the parties understood that the boundary lines as represented on Exhibit "B" were, in fact, the correct boundary lines of the realty in question. In other words, Daphne Allen was to receive the property to the south and James Allen the property to the North. Therefore, I am extending the north boundary line of Daphne Allen's tract to the far west. I am ruling that Daphne Allen is awarded that portion of the undivided tract of land west of the current west boundary line and south of the current north boundary lines of Daphne Allen's property as set forth on Exhibit "B." James Allen is awarded that portion of the undivided tract that is located west of the current west boundary line and north of the current south boundary line of James Allen's property as set forth on Exhibit "B." . . . . I am basing my rulings on the discussions that took place at mediation on April 24, 2009, and the representations of the parties on that date.

---

[1]The record does not indicate whether the parties were ordered to return to Bishop, or whether they returned by agreement.

A visual representation of her ruling is depicted below:



After Bishop's finding, James filed a motion to vacate the "arbitration award,"[2] arguing

that it was obtained by corruption, fraud, or other undue means, and that there was no agreement to

arbitrate. The trial court set the matter for hearing.

At the hearing regarding the dispute, James contended that he signed the MSA because his

attorney represented to him that he would be awarded all fifty-nine acres of the disputed property.

James explained that he attended the mediation over the telephone, received Exhibit B via

---

[2]For reasons discussed below, we disagree with James' characterization of Bishop's fact-finding as a binding arbitration award.

facsimile, and was not able to see the color coding dividing the property. James testified that he expressed concerns regarding the property division to his attorney during the mediation and had faxed Exhibit B back to his attorney with markings indicating his intent to claim the entire fifty-nine acres. James' drawing, marked Exhibit C,[3] was not attached to the MSA, and James acknowledged that he signed the MSA knowing Exhibit B, not Exhibit C, was attached. James also initialed Exhibit B.

Daphne testified that the mediation was intended to divide all of the marital property, that the fifty-nine acres had been discussed, that she was consistent in her assertions seeking the front half of the fifty-nine acres, and that she understood the mediation awarded her the front half of the fifty-nine acres. Her understanding of what constituted the "front half" was based on the location of a fence line indicated on Exhibit B. The map contains a notation "Fence Line Just Beyond 2nd Pond And Includes Hay Field But Not Alfalfa Field." Because the front half of the disputed property is a hay field, and because the fence line continued across the entire length of the undivided acreage, Daphne believed it had been awarded to her during the mediation. Her belief that the disputed property had been divided also rested on the fact that the access easement was actually a roadbed located in the middle of the fifty-nine-acre tract. However, although she claims she did not realize it, Daphne admitted that Exhibit B failed to outline any division of the fifty-nine acres.

---

[3]Exhibit C was a duplicate of Exhibit B, with one variation. Where we have included the notation "Disputed Property (not color coded)," James had written "59 That I Claime [sic]."

7

At the conclusion of testimony taken at the hearing, an argument was made that Bishop, as "sole arbiter of any disagreement with regard to the drafting and intent of the final documents to effectuate this Agreement," had already decided the division of the fifty-nine-acre tract. The trial judge determined "that the parties agreements included arbitration by Karen Bishop to be binding, therefore, pursuant to the Texas Family Code Section 6.601(b)[4] the court will enter an order reflecting the arbiter's award." Thereafter, James moved the trial court to enter a final decree of divorce. During the divorce hearing, James testified he had hired surveyors to draw boundary lines and create metes and bounds descriptions of the property divisions as set forth in Bishop's findings.[5] By the time of the divorce hearing, James acknowledged that the survey was prepared in accordance with the MSA, including Bishop's finding concerning the fifty-nine-acre tract. James asked the court to enter a final decree following the survey and Bishop's division of property. He agreed there was an established fence line. In accordance with James' testimony, the trial court entered a final decree of divorce, which was "stipulated to represent a merger of a mediation agreement between the parties." The final decree's "just and right division" of the tract

---

[4]Section 6.601 of the Texas Family Code states:

> (a) On written agreement of the parties, the court may refer a suit for dissolution of a marriage to arbitration. The agreement must state whether the arbitration is binding or nonbinding.
> (b) If the parties agree to binding arbitration, the court shall render an order reflecting the arbitrator's award.

TEX. FAM. CODE ANN. § 6.601 (Vernon 2006).

[5]The trial court entered an order reflecting Bishop's findings on February 10, 2010, and James' survey was conducted on March 24, 2010.

8

was in accordance with Bishop's findings." The trial court's final decree, including property division accepting the division of the fifty-nine acres, was prepared by James. However, the trial court accepted Daphne's surveys, providing metes and bounds descriptions of Daphne's and James' tracts, conducted after another, unrelated dispute arose regarding the angle at which the fence line was drawn.[6]

The trial court did not order arbitration, and the record does not reflect entry of an order returning the parties to Bishop to resolve the dispute over the fifty-nine acres. Thus, it is possible James voluntarily agreed to have Bishop decide the dispute, and then filed a motion to vacate Bishop's findings after notification of the resolution. James now argues that the trial court erred in concluding that the parties entered into binding arbitration because the MSA "did not provide for binding post-mediation arbitration by the same mediator as to issues other than drafting disputes." Daphne argues that the trial court's finding that the MSA agreements included arbitration "was unnecessary, since they [sic] parties had already submitted their differences to arbitration, evidently by agreement."

---

[6]The access easement in favor of the property conveyed to James was also set forth by metes and bounds description in a separate exhibit.

**II.     There Was No Binding Arbitration in this Case**

We first note that no binding arbitration took place in this case.[7]  TEX. FAM. CODE ANN. § 6.601.  The parties agreed to mediation, not binding arbitration.[8]  TEX. FAM. CODE ANN. § 6.602 (Vernon 2006).  Rather, the parties had entered into a binding mediation settlement agreement.  Section 6.602 of the Texas Family Code states:

> (b) A mediated settlement agreement is binding on the parties if the agreement:
>
>> (1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;
>>
>> (2) is signed by each party to the agreement; and
>>
>> (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.
>
> (c) If a mediated settlement agreement meets the requirements of this section, a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.

TEX. FAM. CODE ANN. § 6.602(b), (c).

Because the MSA, signed by each party and their attorney, stated in boldface type that the MSA was "binding on the parties," "and not subject to revocation, repudiation or withdrawal of consent," Daphne was entitled to judgment on the MSA.  The question in this case was the scope of the MSA.

---

[7]We do not preclude the possibility of a MSA requiring binding arbitration as in *In re Provine*, 312 S.W.3d 824, 827 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

[8]As explained below, any error in the trial court's characterization of the nature of the agreement was harmless.

**III.    Per the MSA, Bishop Was Granted Authority to Resolve the Dispute**

James argues that the trial court erred in holding Bishop had the authority to decide division of the fifty-nine acres.  The MSA provided that Karen D. Bishop would be the "sole arbiter of any disagreement with regard to the drafting and intent of the final documents to effectuate this Agreement."[9]  In this case, there does not appear to be a factual dispute.  Both Daphne and James testified the MSA was intended to dispose of the fifty-nine acres, and both believed that the MSA had divided the property.  Specifically, direct examination of James produced the following:

> Q    Now, you went to mediation also back on April 24th and you had Cary Crump as your lawyer at that time; correct?
>
> A    Yes, ma'am.
>
> Q    And in that mediated settlement agreement there was -- there's some property included in that; correct?
>
> A    Yes, ma'am.
>
> Q    Some real property?
>
> A    Yes, ma'am.
>
> Q    And that's what the issue is today, correct?
>
> A    Yes, ma'am . . . .

---

[9]This does not equate with binding arbitration.   In this case, the trial court was free to find the disputed property was not included within the MSA, and therefore, could have rejected Bishop's finding that it was.  Thus, Bishop's determination was by no means binding.

Q       And you were given -- you agree that you were given the property outlined in yellow?

A       Yes, ma'am.

Q       Correct?   And you agree she could also have the property outlined in red?

A       Yes, ma'am . . . .

Q       Okay.   It's -- how many acres is that?

A       Fifty-nine.

Q       And that's not included in any of these outlines; correct?

A       Not in any of those outlines, no.

Q       Now, you signed off on this mediated settlement agreement?

A       I did.

Q       Your signatures are on this last page?

A       Yes, ma'am.

Q       Did you know that this triangle was not outlined?

A       Yes, ma'am.   I knew it was not outlined.   I stated it to Cary that it was not outlined.

Q       Okay.   And what did you think was going to happen to this piece of property after mediation?

A       He told me that I would receive it because she had outlined the property that she wanted.

James also objected to the placement of the easement, an easement which he would not have been granted had he been awarded the entire fifty-nine acres.   Because both parties acknowledged that

12

division of the fifty-nine acres had been discussed during the mediation, as evidenced in Bishop's arbitration ruling stating the ruling was based "on the discussions that took place at mediation on April 24, 2009, and the representations of the parties on that date," the MSA provided that Bishop be the sole arbiter of "drafting and intent of the final documents" regarding the fifty-nine acres. Bishop's report recognizes the limitations of her role and stated that she could resolve the fifty-nine-acre tract issue as it involved the intent of the mediation document. Bishop determined that the parties intended to divide all realty and understood the boundary lines; she then explained the boundaries as intended. Her decision was based on the discussions at the mediation and the representations of the parties. In essence, Bishop found the division of the fifty-nine acres, as set out in her letter, was a part of the MSA reached by the parties during the mediation session. James' briefing provides no authority suggesting otherwise.[10] In fact, he incorporated Bishop's ruling when conducting surveys of the property and asked the trial court to enter a final decree of divorce dividing the property in accordance with the finding.

We find that because Daphne was entitled to enforce the MSA, the trial court did not err in finding that Bishop was authorized to decide the issue, to determine the intent of the mediation document and to determine the manner in which the parties intended to divide the fifty-nine acres in dispute.

---

[10]Instead, James' authority argues on appeal that the trial court's award was not just and right. However, Daphne was entitled to enforce the MSA, in which the parties agreed to a property division. "[S]ection 6.602 is also an exception to sections 7.001 and 7.006 in allowing a judgment to be entered on a section 6.602 agreement without a determination by the trial court that the terms of the agreement are just and right." *Cayan v. Cayan*, 38 S.W.3d 161, 166 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

13

For reasons stated within, we overrule James' sole point of error.

## IV. CONCLUSION

We affirm the trial court's judgment enforcing the parties' mediation settlement agreement.

Jack Carter
Justice

Date Submitted:     March 25, 2011
Date Decided:       March 30, 2011